In the Matter of Proving the Last Will and Testament of WILLIAM CASE, Late of the Town of Conesville, Schoharie County, Deceased.

Surrogate's Court, Schoharie County, March 5, 1926.

**Wills — execution — testator drew will on blank form and wrote name in attestation clause — name of one witness appears above signature of testator and on line opposite letters " L. S."— evidence shows one witness saw instrument and saw testator writing what he said was his signature — testator told other witness he had signed his will and pointed to signature — testator stated to third witness that paper was his will — will admitted to probate.**

A will drawn by testator on a blank form should be admitted to probate, though testator's name preceded by the word " me " appears in the attestation clause after the words " subscribed by " and the name of one of the three witnesses appears above the signature of the testator on the line opposite the letters " L. S.," where the evidence shows that the writing on the instrument, except the names and addresses of the witnesses, is that of the testator; that the testator in subscribing his name intended said signature as his subscription to the will; that one witness saw the instrument and saw the testator writing what he said was his signature; and that in requesting a third witness to subscribe the instrument, testator declared he had signed his will and pointed to the signature.

Moreover, the fact that all three witnesses testified that they were alone with the testator at the time he is alleged to have told them he had executed his will, together with the fact that the will is holographic, negatives every presumption of fraud or undue influence and warrants a finding that he intended said paper as a testamentary disposition of his property.

PROCEEDING for probate of will.

*Wallace H. Sidney*, for the proponent, and special guardian.

*F. Walter Bliss*, for the contestant.

BEEKMAN, S.   The paper which is propounded for probate in this proceeding bears the word " Will " at the top and commences in the usual form, with the printed words: " In the Name of God, Amen, I."   Then follow the written words " William Case, of the town of Conesville, Schoharie County, State of New York."   After these words the printed form continues, " being of sound mind and memory and considering the uncertainty of this life, do, there-

fore, make, ordain, publish and declare this to be my last will and testament, that is to say, first, after all my lawful debts are paid and discharged, I give and bequeath." In the blank space following the testator makes his bequests and devises and appoints the executors of his last will. After the printed words, "Hereby revoking all former wills by me made," the instrument ends as follows, viz.:

"In Witness Whereof, I have hereunto subscribed my name, and affixed my seal, the....L. S..... day of  Aug. 20, 1923  in the year one thousand eight hundred and, 23

"Witnesses,                    WILLIE T. BUEL.   (L. S.)

"The above instrument, consisting of one sheet, was at the date thereof subscribed by   ME   WILLIAM   CAS   the Testat named in the foregoing Will, in the presence of us and each of us, and at the time of making such subscription the above instrument was declared by the said Testat      to be      Last Will and Testament, and each of us, at the request of said Testat      and in presence, and in the presence of each other, sign          name as witness   thereto, at the end of the Will.

"CECIL A. CAMMER Residing at Conesville N. Y.

"FRANK M CHAMPLIN Residing at Conesville N Y"

The words in capital letters above are in handwriting. According to the testimony of the witnesses, who were well acquainted with the testator, all of the handwriting, except the names and addresses of the witnesses, is in the handwriting of William Case, the testator.

The reverse side of the instrument bears the words: "Last Will and Testament of William Case.   Dated August 20, 1923."

All of the handwriting, including the signatures of the witnesses, is in red ink.

The will is contested on the ground that the instrument was not executed as a will with all the formalities required by the statute. The deceased was a merchant in the neighborhood of seventy years of age, and actively engaged in the management of his business. There is no claim that he was of unsound mind or that any undue influence had been exercised upon him, or that there was anything fraudulent in the premises. In certain proportions, he gives his property to his wife, his son, and two of his grandchildren, providing that certain of the legatees have certain life estates. He appoints his son and a grandson executors and in the body of the will he refers to certain funds in the bank "at this date, Aug. 20, 1923," which is the date stated below as the date of the will.

After considerable research I have been unable to find any reported cases in which the circumstances are exactly similar to the circumstances of this case. The testimony discloses the efforts of a layman to prepare and execute a will upon one of the ordinary printed blank forms without the assistance of a lawyer.

The witness Cammer states that on the morning on which he signed this paper he went to Mr. Case's store, about eight or nine o'clock, and that he and Mr. Case were the only persons in the store at the time.

In the lengthy examination of the witness the following are some of the questions and answers thereto: " Q. What did Mr. Case say to you on this morning when you say you signed this paper? A. Why, he said he had a paper he would like me to sign. He made a will — thought every man when he was getting old should make a will, and he would like to have me sign it as one of the witnesses. Q. And said to you that he had made his will? A. Yes, sir. Q. I show you this paper marked Proponent's Exhibit A and ask you whether or not on this morning he handed you this paper. A. He did. Q. For you to sign? A. Yes, sir. Q. Did he hand it to you after he said he had made his will? A. Yes, sir. Q. He saw you sign it? A. Yes. Q. He stood right back of your back looking over? A. Why he stood beside me, right where he could see me. He brought it around on the show case. Q. After he told you that it was his will and he wanted you to be a witness, it was promptly after that was it, that you signed your name, Cecil A. Cammer, Conesville, N. Y., as it now appears on this paper? A. Yes, sir." He subsequently says that Mr. Case gave him the ink and pen with which to sign and showed him where to sign his name and he signed right where Mr. Case could see him. " Q. Now, after you signed the will or after you signed this paper, Proponent's Exhibit A, what did Mr. Case do? A. Took it and walked around to his desk and signed it or wrote his name on it. Q. He did that right in your presence? A. Yes, sir. Q. And about how long after you signed it? A. Perhaps two minutes. Q. Wasn't it directly afterward? A. You could call it directly — quick as a man could walk around and do it. Q. You stood where you could see him do some writing? A. I could see him write. Yes. Q. You are not absolutely clear whether he wrote his name on the will or on this paper Proponent's Exhibit A before or after you signed it, are you — so as to be absolutely sure about it? A. I think he wrote it after. Yes, I am certain he wrote it after. Q. You were sworn the other time on this hearing [counsel referring to the first examination of the subscribing witness before objections were filed] and did you then

testify that you weren't quite clear? A. I think I did first, but I told you afterwards I thought I signed it first and he signed it afterward. Q. What did Mr. Case say after you say he signed his name on this paper? A. I don't think there was any conversation concerning the will after he signed it. Q. Are you sure whether there was. A. I am not absolutely certain — I don't remember any. Q. Now, to refresh your recollection, I am going to ask you if Mr. Case said this: ' Mr. Case told me he would like to have me sign his will and went and got it and wanted me to sign, and I signed my name and he took the will around to his desk and wrote on it — said he had signed it in my presence and he thought the others could swear to his handwriting, and that would be all that was necessary.' Mr. Bliss: Objected to as leading, and as including a number of alleged facts not already proved in this proceeding. Mr. Sidney: This question is asked purely to refresh the recollection of the witness. [Overrule the objection. Exception.] A. I think he did say the others could swear to his handwriting. Q. Didn't he say all of that? A. I told you he had said the rest. Q. Then by that you mean all Mr. Case said was: ' Mr. Case told me he would like to have me sign his will, and went and got it, and wanted me to sign, and I signed my name, and he took the will around to his desk and wrote on it; said he had signed it in my presence and he thought that the others could swear to his handwriting? ' A. The way you read that he said he signed after he did so. I didn't think I told you in that way. He told me that, but not in the way it reads there. No, I don't think so. I didn't mean to tell you it was after he signed it that he told that. * * * Q. Did he say anything about the others? A. He said he would sign it in my presence and he thought the others could swear to his handwriting. Q. And immediately after he went and signed it in your presence? A. Yes, that is the best of my recollection. Q. You know Mr. Case's handwriting? A. Yes. Q. Seen him write a great many times? A. Sure. Q. I now show you this paper which you say you signed and ask if the words ' William Cas ' in this paper, after the word ' me ' and before the words ' the testat ' is in the handwriting of William Case? A. It is. Q. I ask you if the words William Case on the back of this paper is in the handwriting of William Case? A. Yes, sir. Q. Are the words 'August 20, 1923 ' also in the handwriting of William Case? A. I think they are. * . * * Q. Your memory is rather hazy, isn't it, as to most of these transactions? A. I suppose it is, because I didn't take the pains that I ought to to try to remember. I didn't realize the importance of remembering. Q. You didn't know whether it was at all important whether he told you it was his will before or after

he signed it? A. No. Q. You didn't try to remember that? A. I remember he told me that it was his will."

Throughout his testimony other than what is quoted he reiterates Case's declaration that this instrument was his will and that he desired Cammer to sign as a witness to it. It appears from the testimony that it was about six feet from where the witness Cammer stood to the desk on which Cammer said he saw Case do the writing when Case said he would sign the will.

On his cross-examination the following question was asked Cammer: " Q. You were so far away you couldn't see it, weren't you? You would have had to walk around beside him to see it? A. No, I don't think I would if I had looked carefully."

The witness said that he could see Case write, that he used his right hand, that he could see his arm moving and that he could see the paper and could see him write; and later in his testimony he said that this paper was the only one on the slanting part of the desk and he says he was sure that there was nothing on the slanting part of the desk except the paper that Case was writing on. The version of the witness is that he stood on one side of the counter or showcase and that Case signed on his desk on the other side of the counter.

The witness said he did not think the name of Frank M. Champlin was on the will when he signed it, and didn't know whether Buel's name was on it or not.

It will be observed that the witness Cammer said he had seen Case write many times and that the words " William Cas " after the word " me " were in the handwriting of William Case.

The testimony of the witness Champlin is given at considerable length and I will not attempt to quote any large portion of it. He swears that he went into Mr. Case's store and Mr. Case wanted him to sign his will as a witness, saying that he thought that it was time that a man of his age made his will. Champlin testifies that Mr. Case said that Cecil A. Cammer had signed as a witness and the witness further says that he signed his name under Cammer's name; that he is familiar with the handwriting of Cammer, and Buel and that their respective names were in their handwriting. He further says he was familiar with Mr. Case's handwriting and that all the handwriting on the instrument with the exception of the names and addresses of the witnesses was in the handwriting of William Case. He further says that he saw the words, " William Cas " in the attestation clause before the words " the testat " and that Mr. Case pointed to the words " William Cas " and said he had signed the will and he thought the witnesses would know his signature.

The inference from the entire testimony of Champlin is that Mr. Case produced the will and pointed his finger to the words " William Cas " in the attestation clause and said he had signed the will and declared the paper to be his will and asked Champlin to sign as a witness and that Champlin did sign as a witness as appears on the instrument.

Willie T. Buel, the witness whose signature appears opposite the L. S., testifies: " It was in the forenoon, in the morning. I went in the store. He said he had a paper there he wanted me to sign. It was his will, and wanted me as one of his witnesses, and said he thought it was about time that he made a will and knew how his property was going and I said it was all right for anyone to make a will, and he handed the paper to me to sign, pointed to the line where I should put my name." Buel testified that he signed the paper on the line opposite the letters " L. S." in the place where it appears upon the instrument; says that he had known Mr. Case for twenty years or so. He says he didn't look to see whether there were any names on the paper when he signed it and didn't know whether there were any names on the paper or not at the time he signed it and that Mr. Case didn't tell him who the other witnesses were. He further says that the paper was folded. He says that he had known Case for twenty years; that he knows Mr. Case's handwriting and that the handwriting, that is, the written portions of the paper, not including Buel's name and the names and addresses of Cammer and Champlin, is in the handwriting of Mr. Case. He says he couldn't say whether the words " William Cas " were on the will at the time he signed it or not.

When we study the instrument in question, it becomes apparent that the testator made every effort to conform to what the blank seemed to indicate should be done. After the printed words " affixed my seal the," he evidently thought that what he should declare as his seal should be specifically mentioned, so he puts the capital letters " L. S." after the word " the " to show that that, the " L. S.," is his seal; again, we notice that in the first line of the attestation clause there is a blank space after the words " subscribed by " and evidently the testator concluded that here was the blank space which was left for a testator to fill in his testamentary subscription or signature. The little word " me " is significant. In none of the other cases reported do I find where the testator has used the word " me " where he has put his signature in the attestation clause. The word " me " indicates that he was certain that here was the place for him to subscribe his testamentary signature and we find the words " me William Cas." He evidently intended to make it as specific as he could, so that here any one

could see that this instrument was subscribed by him for the purpose of completing his last will and testament.

The letter " e " is absent at the end of his name; whether because the ink on his pen was exhausted when he finished writing the " Cas " or because he subscribed his name quickly, we, of course, do not know.

We may find the explanation why he asked the three men instead of two to act as witnesses. The explanation is probably as follows: He observes that above the attestation clause is the word " witnesses." Nearly opposite that word is a blank line with " L. S." at the end and as a layman he has probably thought that the word " witnesses " opposite the line indicated that this dotted line was for a witness. Under the attestation clause, which contains the word " witness " in the last line, are two additional blank lines with the words " residing at " after each. Therefore, he evidently thought that there were three blank lines upon which the witnesses should sign their names and addresses. This left only the blank line following the words " subscribed by " on which the testator could sign, and there can be no doubt, taking all the testimony together, that here is the place where he wrote his name in the presence of witness Cammer. When he said that the witnesses would know his signature, it is not to be supposed that he meant the name " William Case " on the first line of the will, or the name " William Case " on the back of the instrument. This conclusion is further borne out by the fact that Champlin swears that he saw the words " William Cas " in the attestation clause and that Case pointed to the " William Cas " when he asked Champlin to become a witness to the will.

When we review all the testimony; all that was said and done; testator's references to his age and that it was time he made his will; that he had made his will; that others would know his signature; that it is plainly shown that he himself wrote the instrument and laboriously and meticulously attended to so many details, only consistent with the execution of a will, is it possible to doubt that he did sign his name where it appears in the attestation clause in the presence of Cammer, with the intention of making it his testamentary signature?

Furthermore, we cannot discard or exclude the consideration that it is not improbable that Case, after he had signed his name, said to Cammer that he had signed his name and that Cammer has failed to remember the exact order of all the details. Even though Case did not sign his signature in the presence of Champlin, but pointed to it and acknowledged it, the attestation clause is some evidence of the regularity of the execution of the paper as a will.

While Cammer says in one part of his cross-examination he did not actually distinguish the words " William Cas " in the attestation clause, he certainly swears that he saw William Case write, while he was standing only about six feet from where Case was writing, and in fact testifies that he could have distinguished the name " William Cas " from where he stood, had he thought it was important, and given the matter the attention he ought to have given it.

It does not seem just or reasonable under the law that a will should be defeated when executed in the presence of a witness, because without the knowledge of the testator the witness should turn his head or look out of the window while the testator was signing his name to the instrument intended as a will, and then, when the will comes on for probate, say that he did not actually distinguish the name which the testator said he was writing in his presence.

There are two ways in which a will may be executed and published. One is by it being subscribed and published in the presence of the witnesses; and the other, where the will may be signed in the absence of the witnesses and the signature subsequently acknowledged and the instrument declared by the testator to be his will, and subscribed by witnesses at his request.

The statute says such subscription shall be made by the testator in the presence of each of the attesting witnesses, *or* it shall be acknowledged by him to have been so made to each of the attesting witnesses.   It has been held that a will may be subscribed by the testator in the presence of one witness and the signature thereafter acknowledged to the other.   (*Gardiner* v. *Raines*, 3 Dem. 98.)

We conclude from the evidence that the testator did subscribe this instrument in the body of the attestation clause, with the intention of making his name as his subscription, in the presence of Cammer and declare it to be his will, and request Cammer to be a subscribing witness.   The statute does not specifically say that a testator must sign before a subscribing witness shall sign.   However, referring to the case of *Jackson* v. *Jackson* (39 N. Y. 153) it will be observed that in the *Jackson* case this language is used: " May the testator keep these signatures [namely, the signatures of the witnesses] in his possession one hour, one week or one year, and then add his signature?   Certainly not, *unless he summons the same persons to see him sign*, or hear his acknowledgment thereof." It will be observed that the word " or " is used.   The judge, in writing that decision, there indicates that in case the subscribing witness signs first, the testator may " summon " the same person to see the testator sign, or in case the subscribing witness has not

seen the testator sign, he may call upon the witness to hear him acknowledge his testamentary signature and that would be in conformity to the statute.   The word " summon " here undoubtedly signifies that he calls the witness' attention to his signing or gives notice in any way to the witness who has first signed, to see him (the testator) sign.   According to Cammer's testimony the testator did do that in this case, for Cammer says Case told him instantly after Cammer signed that he would sign the will in his presence and he thought the others could swear to his handwriting, and Cammer saw him write.   The testator, therefore, did exactly what the court in *Jackson* v. *Jackson* said would be effectual in case the testator kept the paper with the signature of the witness thereon in his possession a period of time after the witness had signed.

In *Matter of Mackay* (110 N. Y. 611–615) the court says the witness should either see the testator subscribe his name or he should, the signature being visible to him and to them, acknowledge it to be his signature.   The court there holds that when the witness saw the testator subscribe his name that is sufficient, providing the instrument is declared to be a will, and the witnesses are requested to sign as witnesses.   Where a will is not subscribed in the presence of the witnesses, the visible signature should be shown to the witnesses and the testator should acknowledge it to be his signature and declare the instrument to be his will and ask them to sign. The other witness, Champlin, shows that was done in his case. So the situation in the case at bar is that the court is convinced from the evidence that the testator subscribed his name in the attestation clause with the intention of making it a signature or subscription to his will and that he did it in the presence of Cammer, and acknowledged his signature to Champlin.   The fact that he intended that signature in the attestation clause to be his signature to the will is proved by the fact that he told Champlin that he had signed the will and pointed to the signature.

As far as the testimony of Buel is concerned, it shows part of the surrounding circumstances, and corroborates the testimony of the other two witnesses as to the testator intending this paper to be his will.   It showed that he referred to this paper as his will.   All three of these witnesses swear that they were alone with the testator at the time, which, together with the will being holographic, negatives every presumption of fraud or undue influence, and shows that he intended this paper as a testamentary disposition of his property.

As to what is " signing in the presence of," the court in *Gardiner* v. *Raines* (3 Dem. 98, 102) holds that it is sufficient where the witness has his attention directed to the act of signing on the

occasion when it is being done, and says " In *Burke* v. *Nolan* (1 Dem. 436), the surrogate, discussing the question of publication of a will, says: ' It may well be that if the witness was in such a position that he *could and ought* to have heard what was said, the remarks should be considered as having been made within his hearing, on the same principle that, if he was in a position to see the testator sign the will, it must be deemed to have been signed in his presence.' In *Spaulding* v. *Gibbons* (5 Redf. 316) it is said that ' if the witness was in the same room with the testator, or in the adjoining room, in such a position that he could see him sign, *after his attention had been drawn to what was going on*, the signing will be considered to have taken place in his presence.' "

Cammer certainly had his attention drawn to what was going on.

In *Gardiner* v. *Raines* (*supra*, 104) this language is used: "A will, however, may be signed in the presence of one witness and the signature thereafter acknowledged to the other attesting witness," citing *Matter of Tonnele* (5 N. Y. Leg. Obs. 254); *Hoysradt* v. *Kingman* (22 N. Y. 372). In *Hoysradt* v. *Kingman* (*supra*) the Court of Appeals says: " The general right to dispose of one's property, by act in writing, to take effect at his death, is established by our statute respecting wills, and has always been the law of this State. The restrictions which, from motives of prudence, are thrown around that right, should be construed *liberally in favor of the testament,* and forms should not be required which the Legislature has not plainly prescribed."

In *Matter of Laudy* (161 N. Y. 429, 433) the court says: " In a case where there is no claim of fraud, if the signature is there and is visible, and the witnesses hear the acknowledgment thereof and the declaration that the instrument is the last will and testament of the person so acknowledging, but they do not look *closely to see the signature thus acknowledged,* although it is before their eyes, the will should not be refused probate because those persons are ignorant, careless or indifferent, for the testator would have done his part and the statute would have been substantially complied with. An inflexible rule that the witnesses must remember that they not only saw, but recognized and identified, the signature of the testator at the time of acknowledgment, would sometimes defeat the object of the statute and lead to injustice."

The above quotation speaks of a signature and its acknowledgment, but the same reasoning applies in this case where the witness Cammer, according to his testimony, saw the instrument in question and saw the testator writing what he said was his signature.

In *Matter of Carll* (38 Misc. 471, 474) the court says: " Upon all the evidence, I am satisfied that the signature could have been

seen, and if the witnesses could see, then, legally, they did see," citing *Matter of Laudy* (161 N. Y. 429, 433) and *Matter of Stockwell* (17 Misc. 108).

In *Matter of Baldwin* (67 Misc. 329; affd., on opinion below, 142 App. Div. 904; affd., 202 N. Y. 548) the court says: "A witness must sign at the request of the testator; but, though he may have signed in advance of the request, his act in that respect may become his signature made at the testator's request, if the request succeeds the signature.

" Where the witnesses have signed in advance of the testator, their signatures may conceivably become an attestation of his subscription, if it be thereafter supplied.

" Each of the acts necessary to the testamentary transaction depends for its efficacy upon the due performance of the other acts to which it is related; but the lesson of the cases is that, where there has been a disturbance of their normal order, these acts, if all performed upon the same occasion, shall still be regarded as bearing to one another the same significance as would be accorded them if their natural succession had been observed.

" If a witness has signed without either a declaration or a request, but hears both before the testamentary transaction is over, clearly in the contemplation of both testator and witness the declaration and request of one fall into efficient relations with the attestation by the other, and there is a consensus on the part of both that the signature of the witness stands as a token that the will was declared and the signature by the witness was requested.

" If, after the belated declaration, the witness should formally announce that his signature was confirmed with the same effect as if it had been made after the declaration, few would doubt that the witness had attested the act of declaration.

" What, then, is the difference whether the witness ratifies his act expressly or tacitly?  Between a loud and strenuous affirmation that his signature shall stand and the silence by which he refrains from repudiating it, there is a difference of probative degree, but none in substance.  One tends with great force, but the other, nevertheless, tends to show that the witness confirmed his signature and attributed to it the new relation and purpose which the declaration would impose upon it and that the testator at the same time regarded it as an attestation of his own subscription and declaration."

In *Matter of Baldwin* (*supra*) *Vaughan* v. *Burford* (3 Bradf. 78) is cited, in which the court says: " The particular order of the several requisites to the valid execution of a testament is not at all material, provided they are done at the same time, that is, as part of the

same transaction.   What is the *same time and the same transaction*, is the subject of judicial determination in each particular case, depending upon the facts, and incapable of being governed by any general rule."

To the same effect are the following late cases, which hold that where all the statutory requirements have been complied with as a part of one transaction, it is suff..cient, although some of the statutory steps may have taken place out of what may be considered the usual order, namely, *Matter of Haber* (118 Misc. 179), where both witnesses subscribed before the testator; and *Matter of Barry* (119 id. 102), where one witness subscribed before the testator.

While we may examine and cite many cases, nevertheless, each case has its own peculiarities and must be decided accordingly, in the light of the attending circumstances.   The law regards the substance more than form, and is satisfied if the statute is substantially complied with, especially where there is no suggestion of fraud, deception, undue influence or mental incapacity.   There are numerous decisions holding that the fact that a will is holographic resolves many informalities in favor of the probate of the instrument.

In *Matter of Ewen* (206 App. Div. 198, 201), decided very recently, the court well says: " No Procrustean standard has been erected into which every testament's proof of due execution must fit or else be judged invalid.   There is no requisite of unvarying method in the circumstances of proof which will be deemed essential to compliance with the substantial requirements of the statutory mode."

The will is entitled to probate and a decree will be entered accordingly.